IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| In re: | ) | Case No.   11-44738-11 |
| | ) | (Joint Administration Pending) |
| HMC/CAH CONSOLIDATED, INC. | ) | Chapter 11 |
|   et al., | ) | |
| | ) | |
| Debtors. [1] | ) | |
| | ) | |

## AFFIDAVIT OF DENNIS DAVIS IN SUPPORT OF
## DEBTORS' EMERGENCY FIRST DAY MOTIONS

| | |
|---|---|
| STATE OF MISSOURI | ) |
| | )  ss |
| JACKSON COUNTY | ) |

Having first been duly sworn, the undersigned states as follows:

1.      My name is Dennis Davis and I am over 21 years of age and am competent to testify to the matters herein.

2.      I am the Chief Legal Officer of HMC/CAH Consolidated, Inc., ("HMC/CAH" or the "Company") and have served in this capacity for approximately three years.

3.      In my capacity as Chief Legal Officer and Secretary for HMC/CAH, I am responsible for maintaining the corporations' records and overseeing the companies' legal compliance and contracting.  In that capacity I am familiar with the above-captioned debtors' (the "Debtors") day-to-day operations, businesses and financial affairs.

4.      I submit this affidavit (the "Affidavit") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of:  (i) the Debtors' petitions for relief under chapter 11 of title 11 of the

---

[1] The Debtors consist of: HMC/CAH Consolidated, Inc.; CAH Acquisition Company #1, LLC; CAH Acquisition Company #2, LLC; CAH Acquisition Company #3, LLC; Acquisition Company #4, Inc.; CAH Acquisition Company #5, LLC; CAH Acquisition Company #6, LLC; CAH Acquisition Company #7, LLC; CAH Acquisition Company #9, LLC; CAH Acquisition Company #10, LLC; CAH Acquisition Company #11, LLC; and CAH Acquisition Company #16, LLC.

United States Code (the "<u>Bankruptcy Code</u>") filed on October 10, 2011 (the "<u>Petition Date</u>");

and (ii) the relief, in the form of motions and applications, that the Debtors have requested of teh

Court (collectively, the "<u>First Day Pleadings</u>").

5.      Except as otherwise indicated herein, all facts set forth in this Affidavit are based

upon my personal knowledge, my discussions with other members of the Debtors' senior

management, my review of relevant documents, or my opinion based upon experience,

knowledge, and information concerning the Debtors' operations and financial affairs.  If called

upon to testify, I would testify competently to the facts set forth in this Affidavit.  I am

authorized to submit this Affidavit on behalf of the Debtors.

6.      This Affidavit is intended to provide a summary overview of the Debtors and

these chapter 11 cases.  Sections I through IV of this Affidavit provide an overview of the

Debtors businesses, organizational structure, capital structure, and the circumstances giving rise

to the commencement of these chapter 11 cases.  Section V provides an overview of the relief

requested in the First Day Pleadings.

## I.

## <u>The Debtors' Businesses</u>

7.      HMC/CAH Consolidated, Inc., is in the business of acquiring and operating a

system of acute care hospitals located in rural communities that are certified by The Centers for

Medicare and Medicaid Services ("<u>CMS</u>") as Critical Access Hospitals or CAHs.  The core

focus of HMC/CAH's business plan is to replace the technologically out of date and

operationally inefficient medical facilities of its CAHs with newly constructed state-of-the art

facilities.  Since its incorporation, HMC/CAH has purchased twelve (12) rural hospitals certified

as Critical Access Hospitals (collectively, the "<u>CAH Hospitals</u>").  These CAH Hospitals are

located in the following States:  Kansas (3), Oklahoma (5), Missouri (1), Tennessee (1) and

North Carolina (2).

8.      The CAH Hospitals are the lifeline of the communities that they serve.

Specifically, the CAH Hospitals provide critical health services to rural residents, including

emergency medical services.  In the absence of the CAH Hospitals, the rural residents would

require a significant and unacceptable amount of time to reach comparable health facilities.  The

CAH Hospitals also provide some of the most stable and highest paying employment

opportunities in their communities.  Indeed, in most the communities in which it operates, the

CAH Hospital is the communities' second largest employer, behind only the county government.

Accordingly, the importance of preserving the CAH Hospitals on a going concern, with full

CAH certification, cannot be overemphasized.  If the CAH Hospitals lose their CAH certification

or otherwise shut down, the rural residents served by these hospitals will experience material

reductions in access to quality health care, and the communities will suffer material losses of

employment.

The Critical Access Hospital Industry

9.      The vast majority of rural hospitals in operation today were built between the late

1940s and the early 1980s under the Hill Burton Act, a Federal grant program that provided the

"seed" or equity capital required to build rural hospitals.  Most of these facilities are now

obsolete and lack the ability to accommodate the technological changes that have occurred in

healthcare over the past fifty years.

10.     To make matters worse, the CMS reimbursement scheme in effect for all urban

and rural hospitals between 1983 and 1997 was a procedure-based system that paid a fixed-fee.

This so-called "Prospective Payment System" or "PPS" tended to favor urban hospitals and the

larger rural hospitals that have high patient volumes and a patient mix composed mostly of

health insurance plans (e.g., Blue Cross and Blue Shield) and other employer-based payers.

Because most rural hospitals are small and have comparatively low patient volumes and a payer

mix heavily skewed toward the Medicare and Medicaid programs, their profits diminished over

the years. This chronic lowering of profits meant that the typical rural hospital could not

accumulate the balance sheet reserves needed to update plant and equipment. Simply stated,

during the years when they were under PPS reimbursement, the existing Hill Burton facilities in

rural America became increasingly outdated.

11.     This inability to update plant and equipment prompted a vicious downward cycle

of revenue generation. The more outdated and unprofitable rural hospitals became, the more

difficult it was for them to hire and retain doctors and other mid-level practitioners. As a result,

younger, more mobile, patients (and their families) – the ones with employer-based health

insurance – abandoned rural hospitals in their local communities and drove to the nearest urban

(state-of-the-art) medical center for treatment. Market share was lost and the already low patient

volume coupled with high Medicare and Medicaid patient mix for rural hospitals increased –

with the result that between 1983 and 1999 literally hundreds of rural communities lost their

local hospital.

12.     In 1997, the United States Congress finally moved to correct this dire situation by

changing the reimbursement system for small rural hospitals. Under the 1997 Balanced Budget

Act, a new class of rural healthcare was established. Initially, the States (through their health

departments) could list a hospital located in a rural area for CAH status and (if the hospital was

willing to reduce its number of beds to no more than twenty-five) CMS would issue its

certification designating any hospital so listed by the State as a "Critical Access Hospital."

Congress subsequently amended the CAH program to require that only those hospitals that were located more than 35 miles from another hospital could receive certification.  At present, there are approximately 1,300 hospitals (20% of all hospitals in the U.S.) in the United States that have been designated as CAHs.

13.     Once so designated, CAHs are reimbursed by CMS for the "cost" (a regulatory defined term) of the clinical and hospital services they provide to Medicare and Medicaid patients.  It is important to note that such reimbursement also includes the interest on long term debt and the depreciation of building improvements and other capital expenditures (e.g. MRI machines and CT scanners).  This is the so-called "Cost-Based Reimbursement System" and it is very favorable to the financial health of small rural hospitals because it enables a higher rate of reimbursement to facilities that have low patient volumes and large Medicare and Medicaid payer mixes.

14.     Following the passage of the 1997 Balance Budget Act and the CAH program, rural hospitals could, for the first time in many decades, generate sufficient revenues to fund their day-to-day operating costs, their mortgage debt, and cash reserves (from the cash payments that were receiving from CMS for depreciation) needed to upgrade existing facilities or to build new facilities.  The stated-goal of Congress for the CAH program – to provide rural communities with improved access to primary care and emergency services by improving the financial viability of rural hospitals – has been fulfilled, and it is not an overstatement to say that the Cost-Based Reimbursement System has been the salvation of health care in rural America.

15.     The practical effect of the amendment adding 35 mile requirement to the Critical Access Program is that (with few exceptions) the program is completed and there are no more CAH designations that can be given by CMS.  If a currently designated CAH facility loses its

certification (even for only one day), it can never become a CAH again – and would thereafter be

eligible to receive CMS reimbursement only under the Prospective Payment System.  A facility

that ceases operation, even for a day, will forfeit its CAH certification.

16.     The CAH Hospitals' loss of CAH certification would cause the CAH Hospitals to

experience a financial disaster and would render them all dramatically unprofitable.

Accordingly, it is essential that the CAH Hospitals retain their CAH certification.

## II.

## Organizational Structure

17.     HMC/CAH is a holding company incorporated in Delaware that owns 100% of

the 12 operating subsidiaries that comprise the CAH Hospitals.  HMC/CAH provides healthcare

management services to the CAH Hospitals and has opened a centralized billing office ("CBO")

in Tulsa, Oklahoma to create efficiencies in billing and collecting accounts receivable and other

back-office services to the CAH Hospitals.

18.     Each of the CAH Hospitals has a CEO and an administrative staff that run the

day-to-day operations of the respective hospitals.  Back-office accounting, billing and collection

work is consolidated through the CBO.

19.     Processing of healthcare receivables requires compliance with multiple

regulations and use of appropriate diagnostic codes that must be properly completed to obtain

payments.  Minor errors can result in significant delays in collection of billings from both

government and private insurance.  Upon acquisition, most of the CAH Hospitals had significant

lag time in billings and collections.

20.     The CBO was established by HMC/CAH to create operational efficiencies and

decrease the turn on receivables.  The CBO has been in operation for less than a year, and the

CAH Hospitals are in various states of transition to the CBO. All but three of the CAH Hospitals have been transitioned to the CBO. The last transition was Horton Community Hospital which converted on October 1, 2011. The next conversion is scheduled for October 15, 2011 for the Prague Community Hospital.

21.     Since the implementation of the CBO, HMC/CAH has seen a significant improvement in the turn rate on its receivables and has been able to increase the pace of collections for the services that the CAH Hospitals have performed.

22.     HMC/CAH's executive offices also provide the strategic planning services for the CAH Hospitals, including focusing on capital replacement and building of new hospitals as well as capital lending and investment. The replacement of the aging facilities with new facilities has a dramatic impact on each CAH Hospital to attract both patients and staff which has the net effect of improving gross revenues.

### III.

### Capital Structure

Accounts Receivables Financing

23.     Gemino Healthcare Finance, LLC ("Gemino"), HMC/CAH, HMC Management, CAH 2, CAH 3, CAH 5, CAH 7, CAH 9, CAH 10, CAH 11, CAH 12, and CAH 16 (collectively, the "Debtor A/R Borrowers") are parties to that certain Credit Agreement, dated as of April 12, 2010, as amended, pursuant to which Gemino has provided a secured revolving Credit Facility[2] in the maximum amount of $6,000,000.00 (the "A/R Facility") to the Debtor A/R Borrowers.

24.     The amounts borrowed under the A/R Facility were used to fund general working capital requirements. As of the Petition Date, approximately $4,600,000 was outstanding under

---

[2] Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to such terms in the agreement or document in which they are referenced.

the A/R Facility (the "Gemino Prepetition Obligations").  As of the Petition Date there was no

remaining availability under the A/R Facility.

25.     Pursuant to the A/R Facility, the Debtor A/R Borrowers granted first priority liens

and security interests in favor of Gemino in substantially all of the Debtor A/R Borrowers'

personal property assets, including, the following:  (i) all accounts, payment intangibles,

instruments and other rights to receive payments of Debtor A/R Borrowers (including without

limitation the Accounts), whether now existing or hereafter arising or acquired; (ii) all General

Intangibles (including without limitation, contract rights and Intellectual Property), Chattel

Paper. Documents, supporting obligations, Letter-of-Credit Rights, certain identified

Commercial Tort Claims, remedies, guarantees and collateral evidencing, securing or otherwise

relating to or associated with the property in subpart (i) above, including without limitation all

rights of enforcement and collection, (iii) all Commercial Lockboxes, all Government

Lockboxes, all Collection Accounts, (iv) all funds received thereby or deposited therein, and any

checks or instruments from time to time representing or evidencing the same, (v) all books and

records of Borrower evidencing or relating to or associated with any of the foregoing; (vi) all

information and data compiled or derived by Borrower with respect to any of the foregoing

(other than any such information and data subject to legal restrictions of patient confidentiality),

and (viii) all collections, Accessions, receipts and Proceeds derived from any of the foregoing

(collectively, clauses (i) through (viii), the "Gemino Prepetition Collateral").

26.     Pursuant to the A/R Facility, the Debtor A/R Borrowers have agreed that the

proceeds of their Accounts are swept to a separate lockbox account for each of the Debtor A/R

Borrowers located at Citizens Bank of Pennsylvania in which Gemino has a first priority

perfected security interest.  Pursuant to an account control agreement, the accounts are swept

daily to a Gemino account, and on Wednesday of each week, Gemino will apply receipts against the Debtor A/R Borrowers' lien.

27.     The Debtor A/R Borrowers receive advances on the line pursuant to draw requests funded on Wednesdays pursuant to their borrowing base certificates.

Mezzanine Financing

28.     As described above, the lynchpin of HMC/CAH's business plan is to replace the old Hill Burton facilities of its hospitals with new state-of-the-state facilities.  HMC/CAH typically acquires a rural hospital from a local municipality or, in some instances, private ownership.  Because of the state of the rural hospitals, these acquisition costs have typically been very low, in some instances, HMC/CAH was able to acquire the hospitals merely by assuming the existing liabilities of prior ownership.

29.     Upon acquisition, HMC/CAH typically starts the replacement process at the closing of the acquisition with the concurrent purchase of a 15 acre replacement site.  In most instances this is adjacent to the existing hospital.  Thereafter, HMC/CAH begins the design, engineering, and architecture of the new replacement facility.

30.     There are several federally sponsored loan programs, including programs through the United States Department of Agriculture or through Housing and Urban Development.  Through these programs, generally HMC/CAH may obtain a loan of 80% of the construction costs, convertible to permanent mortgage financing upon completion of construction, and either USDA or HUD will provide a 70% to 90% loan guaranty to the local community lender providing the construction financing.

31.    Under these programs, HMC/CAH must raise the funds to (a) acquire the prior CAH certified hospital, (b) purchase the land to build the new facility; and (c) pay the 20% of the construction costs not loaned through the USDA and HUD programs described above.

32.    To fund these obligations, HPCG Hospital Investment, LLC, an Arizona limited liability company ("HHI") entered into that certain Master Funding Agreement and Amended and Restated Credit Agreement (the "Mezzanine Funding Agreement"), dated as of August 21, 2009, with HMC/CAH, CAH 1, CAH 2, CAH 3, CAH 5, CAH 7, CAH 9, CAH 10, CAH 11 (collectively, the "Debtor Mezzanine Borrowers").

33.    For purposes of CMS cost reporting, each Mezzanine Borrower executed a separate note for those amounts funded under the Mezzanine Funding Agreement related to its facility only.  As such while each of the Debtor Mezzanine Borrowers borrowed funds under the Mezzanine Funding Agreement, each Debtor Mezzanine Borrower is responsible only for those obligations borrowed for its facility.

34.    As of the Petition Date, approximately $13,983,987 was outstanding under the Mezzanine Funding Agreement (the "HHI Prepetition Obligations").

35.    Pursuant to that certain Security Agreement, dated as of August 21, 2009, the Debtor Mezzanine Borrowers granted liens and security interests in favor of HHI in substantially all of the Debtor Mezzanine Borrowers' personal property assets, including, but not limited to, the following:  (i) all Accounts; (ii) all Chattel Paper; (iii) all Deposit Accounts; (iv) all Documents; (v) all Equipment; (vi) all Fixtures; (vii) all General Intangibles; (viii) all Instruments; (ix) all Inventory; (x) all Investment Property; (xi) all Letter of Credit Rights; (xii) all Vehicles; (xiii) all books and records; and (xiv) the proceeds of all the foregoing property

(collectively, clauses (i) through (xiv), the "HHI Prepetition Collateral").  The lien rights are

cross-collateralized among the Debtor Mezzanine Borrowers.

36.     Pursuant to the terms of the Mezzanine Funding Agreement, HHI agreed to

provide HMC/CAH with more than $25,000,000 in funds for hospital facility acquisition and

replacement opportunities.  With regard to funding the replacement of the facilities, HMC/CAH

and HHI would work together to obtain a construction-to-permanent loan from a local or

regional bank for 70%-80% of the total project costs.  Generally, speaking loans of this sort have

not been available unless the repayment of the loan is guaranteed to the bank by the United

States Department of Agriculture (USDA) under its Rural Development Program.  The

remainder of the project costs constituting the "paid-in capital" or owner's equity for the

replacement project was to be funded directly by HHI, or HHI would act in good faith and use its

reasonable best efforts to arrange for one of its affiliates or a third-party to provide the financing.

HHI's financing was due by the closing of the loan with the bank.

Lauderdale Financing

37.     CAH 11 and CFG Community Bank  ("CFG") are parties to that certain Loan

Agreement dated March 31, 2010 (the "CFG Loan Agreement"), pursuant to which CFG loaned

to CAH 11 $2,502,701.00.

38.     As of the Petition Date, approximately $2,502,710 was outstanding under the

CFG Loan Agreement (the "CFG Prepetition Obligations").

39.     Pursuant to the CFG Loan Agreement, CAH 11 granted CFG a security interest in

and to all personal property of CAH 11.  Additionally, CAH 11 executed a Mortgage on the

CAH Hospital's real property in favor of CFG (together with the liens on personal property, the

"CFG Prepetition Collateral").

40.     Pursuant to a certain Subordination Agreement between CFG, CAH 11 and HHI, HHI agreed to subordinate any security interests in CAH 11's assets to CFG. Additionally, HHI agreed that it was an unsecured creditor of CAH 11 and would remain so as long as any debt was outstanding to CFG by CAH 11 under the Loan Agreement.

I-70 Financing

41.     CAH 6, HMC/CAH and First Liberty Bank ("First Liberty") are parties to that certain Loan Agreement dated as of December 6, 2010 (the "First Liberty Loan Agreement"), pursuant to which First Liberty loaned CAH 6 $9,300,000.00 which loan has a USDA Guarantee.

42.     As of the Petition Date, approximately $9,195,960 was outstanding under the First Liberty Loan Agreement (the "First Liberty Prepetition Obligations").

43.     Pursuant to the First Liberty Loan Agreement, CAH 6 granted a security in, among other things, (a) furniture, fixtures and equipment, and (b) all accounts, including Health Care Insurance Receivables. Further, CAH 6 executed a Deed of Trust in favor of First Liberty Bank with respect to the CAH Hospital's real property in Sweet Springs, Missouri (together with the personal property liens, the "First Liberty Prepetition Collateral").

Drumwright Financing

44.     CAH 4 assumed the liabilities of the Drumwright Municpal Healthcare Authority on that certain Mortgage Note dated October 15, 2003 in the original principal amount of $7,666,000.00 (the "Midland Loan Agreement") granted in favor of Midland Loan Services, Inc. ("Midland"), as servicer for the Secretary of Housing and Urban Development ("HUD").

45.     As of the Petition Date, approximately $6,629,121 was outstanding under the Midland Loan Agreement (the "Midland Prepetition Obligations").

46.    Pursuant to that certain Security Agreement, CAH 4 granted a security interest in accounts and the furniture, fixtures and equipment located at the CAH Hospital.  Additionally, CAH 4 acquired the real property of the CAH Hospital subject to the existing real estate mortgage in favor of Midland Loan Servicing, Inc. for HUD (the mortgage, together with the liens of furniture, fixtures and equipment, the "Midland Prepetition Collateral").

Washington County/Oswego Financing

47.    CAH 1  executed that certain Promissory Note (the "Citizens Loan Agreement") in favor of Citizens Bank, N.A. ("Citizens") in the amount of $1,646,688.34.

48.    As of the Petition Date, approximately $1,452,948 was outstanding under the Citizens Loan Agreement (the "Citizens Prepetition Obligations").

49.    Pursuant to the Security Agreement, CAH 1 pledged a security interest in all assets and granted a real estate mortgage on the CAH 1 Hospital.  Additionally, Citizens has a security agreement on all of the assets of CAH 2 and a real estate mortgage on CAH 2's CAH Hospital (collectively with the liens on CAH 1 assets and mortgage on CAH 1 property, the "Citizens Prepetition Collateral").

Recent Financial Information

50.    The Debtors financial performance for the past three years is set forth below:

- FY 2009:
  Began with 4 hospitals and ended year with 8 hospitals.
  Net loss:  ($4,259,686)

- FY 2010
  Began with 8 hospitals and ended year with 12 hospitals.
  Net loss:  ($9,392,026)

- FY 2011
  Began with 12 hospitals and will end year with 12 hospitals.
  Net loss:  projected on budget ($2,300,000)

51.    The Debtors anticipate that, if HHI had not breached the Mezzanine Funding Agreement, as set forth in greater detail below, they would have generated a consolidated profit in the amount of approximately $800,000 for fiscal year 2012.

## IV.

### Events Leading to the Chapter 11 Cases

52.    As described in detail below, HHI's refusals to meet its funding obligations pursuant to the Mezzanine Funding Agreement, in breach thereof, have been the primary cause of the Debtors' filings pursuant to chapter 11 of the Bankruptcy Code.

53.    Between the Fall of 2009 and the Spring of 2010, HMC/CAH and HHI worked together to secure financing for the replacement costs of the hospitals owned by CAH 1, CAH 3, CAH 5, and CAH 7 (collectively, the "Four Hospital Projects").  HMC/CAH and HHI were able to secure bank lenders that would lend up to 80% of the Four Hospital Projects on the basis of a 90% USDA guarantee and that HHI would directly fund the remaining 20% of the project at or before the loan closing.

54.    In the Fall of 2010, HHI represented to the Bank of Hays, Kansas, the bank lender for the CAH 5 project, that it was funding all Four Hospital Projects and it made the same representation to HMC/CAH representatives.  HHI then failed and refused to fund three of the projects and it funded only $500,000 of the paid-in capital required for the CAH 5 project. Ultimately none of the four loans underlying the Four Hospital Projects closed because of HHI breached its obligations to fund its portion of the project costs.

55.    HHI's failure to fund the Four Projects has caused one or more of CAH 1, CAH 3, CAH 5, and CAH 7 to default on their obligations to the sellers (i.e. the local communities) under the hospital acquisition agreements for the Four Hospital Projects.  Specifically:  (i) CAH

1 is in default of its obligation to Washington County, North Carolina, to start construction on

the replacement for the Washington County Hospital facility and has triggered a $700,000

penalty under the CAH 1 acquisition agreement; (ii) CAH 3 is in default of its obligation to the

local not-for-profit hospital corporation in Horton, Kansas, to start construction on the

replacement for the Horton Community Hospital facility; (iii) CAH 5 is in default of its

obligation to the City of Hillsboro, Kansas, to start construction on the replacement for the

Hillsboro Community Hospital facility; and (iv) CAH 7 is now in default of its obligation to the

local not-for-profit hospital corporation in Prague, Oklahoma, to start construction on the

replacement for the Prague Community Hospital facility.

   56.  Moreover, in the event that HHI were to commence foreclosure actions to enforce

their liens on hospital properties and assets will trigger the right and option of the local not-for-

profit corporation in Sweet Springs, Missouri, to reacquire the I-70 Community Hospital from

CAH 6, and the right and option of the local hospital authority in Seiling, Oklahoma, to reacquire

the Seiling Community Hospital from CAH 9.

   57.  On June 30, 2011, the Debtor Mezzanine Borrowers filed suit against, among

others, HHI in the Circuit Court of Jackson County, Missouri (the "State Court Litigation"),

because (among other things) of HHI's failure to perform its contractual obligations, pursuant to

the Mezzanine Funding Agreement.  In the State Court Litigation, the Debtor Mezzanine

Borrowers are also seeking declaratory relief that the Debtor Mezzanine Borrowers are not in

default and that their performance under the Mezzanine Funding Agreement is excused.  The

Debtor Mezzanine Borrowers also sought injunctive relief.

58.     Following the filing of the State Court Litigation, HHI has filed a counter-claim asserting, among other things, a request for foreclosure and authority to notify senior lenders of HHI's position that HMC/CAH is in default.

Impact of HHI's Failures to Fund on A/R Facility

59.     Pursuant to the A/R Facility, the Debtor A/R Borrowers should have an Advance Rate of 50% on Eligible Accounts that exceed $12,500,000.00.  Accordingly, based on the $6,000,000 cap for the A/R Facility, the Debtor A/R Borrowers should be able to borrow the full amount of the A/R Facility in the amount of $6,000,000.00.  However, because of the impact on the Debtors' financial performance of HHI's refusal to fund the Four Hospital Projects, Gemino has taken additional reserves from the Eligible Accounts such that the Debtor A/R Borrowers can only access approximately $4,500,000.00 of availability under the A/R Facility.  Gemino has agreed to allow the Debtor A/R Borrowers to borrow an additional $600,000.00 under the A/R Facility, as an overadvance.  However, even with this overadvance, the Debtor A/R Borrowers have an Advance Rate of only 41%.

60.     In sum HHI's breaches of the Mezzanine Funding Agreement have had the dual negative repercussions of:  (i) causing CAH 1, CAH 3, CAH 5, and CAH 7 to breach their obligations related to the Four Hospital Projects; and (ii) causing the Debtor A/R Borrowers to suffer from an overly restrictive Advance Rate under the A/R Facility.  The net effect of HHI's breaches is that the Debtors do not have sufficient liquidity to continue their businesses and have been forced to seek relief pursuant to chapter 11 of the Bankruptcy Code.

## V.

## First Day Pleadings

Motion for Joint Adminstration

61.     The Debtors have filed a motion ("Motion for Joint Administration") for entry of

an order under Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") (i) directing joint administration of the Debtors' affiliated chapter 11 cases for procedural

purposes only; and (ii) approving a caption for the jointly administered cases.

62.     CAH Acquisition Company #1, LLC; CAH Acquisition Company #2, LLC; CAH

Acquisition Company #3, LLC; Acquisition Company #4, Inc.; CAH Acquisition Company #5,

LLC; CAH Acquisition Company #6, LLC; CAH Acquisition Company #7, LLC; CAH

Acquisition Company #9, LLC; CAH Acquisition Company #10, LLC; CAH Acquisition

Company #11, LLC; CAH Acquisition Company #12, LLC; and CAH Acquisition Company

#16, LLC are all subsidiaries which are 100 percent owned by HMC/CAH. Thus, all are affiliates

eligible for joint administration.

63.     The Debtors request that the official caption to be used by all parties in all

pleadings in the jointly administered cases be as follows:


IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| In re: | ) | Case No.   11-44738-11 |
| | ) | Jointly Administered |
| HMC/CAH CONSOLIDATED, INC. | ) | Chapter 11 |
|    et al., | ) | |
| | ) | |
|                         Debtors.[3] | ) | |

---

[3] The Debtors in these proceedings and the last four digits of each Debtor's federal taxpayer identification number
are as follows: HMC/CAH Consolidated, Inc. (6921); CAH Acquisition Company #1, LLC (4473); CAH
Acquisition Company #2, LLC (2041); CAH Acquisition Company #3, LLC (1827); CAH Acquisition Company

)

64.     Each of the separate entities comprising the Debtors, respectfully pray that this Court

enter an Order: (a) authorizing the joint administration of the proceedings of HMC/CAH

Consolidated, Inc.; CAH Acquisition Company #1, LLC; CAH Acquisition Company #2, LLC;

CAH Acquisition Company #3, LLC; Acquisition Company #4, Inc.; CAH Acquisition

Company #5, LLC; CAH Acquisition Company #6, LLC; CAH Acquisition Company #7, LLC;

CAH Acquisition Company #9, LLC; CAH Acquisition Company #10, LLC; CAH Acquisition

Company #11, LLC; CAH Acquisition Company #12, LLC; and CAH Acquisition Company

#16, LLC for procedural purposes only; (b) authorizing all pleadings to be filed in HMC/CAH's

case, Case Number 11-44738-11, and approving the caption for the jointly administrated cases

substantially in the form of the annexed order; and (c) granting such other and further relief as is

just and proper.

Motion Authorizing Use of Cash Collateral

65.     The Debtors have filed a motion for entry of an order pursuant to sections 361 and

363 of the Bankruptcy Code and Bankruptcy Rule 4001(B) Authorizing Debtor to Use Cash

Collateral and Grant of Adequate Protection (the "Cash Collateral Motion").

66.     Based on a preliminary review of the various loan documents described above, it

appears that the Lenders may make a claim of interest in the Cash Collateral and it appears,

subject to further review and analysis, that the lenders' priority on Debtors' Cash Collateral is as

set forth in **Exhibit A** to the Cash Collateral Motion.

---

#4, Inc. (0680); CAH Acquisition Company #5, LLC (0149); CAH Acquisition Company #6, LLC (4641); CAH
Acquisition Company #7, LLC (5335); CAH Acquisition Company #9, LLC (1868); CAH Acquisition Company
#10, LLC (2520); CAH Acquisition Company #11, LLC (0527); CAH Acquisition Company #12, LLC (0967); and
CAH Acquisition Company #16, LLC (2420).

67.     The Debtors require the use of Cash Collateral to continue their business operations and to pay their regular daily expenses, including employees' wages, utilities and its other costs of doing business.  A 5-week budget (the "**Budget**") showing the Debtors' projected cash expenses is attached as **Exhibit B** to the Cash Collateral Motion.  The Debtors request that the Court allow them to use Cash Collateral as set forth in the Budget.  The Debtors also request that they be entitled to a 10% variance on any single Budget line item and up to a 5% variance on the aggregate Budget for any given week.

68.     In the Cash Collateral Motion, the Debtors propose to use the Lenders' Cash Collateral and provide adequate protection as described below:

- Each of the Lenders is granted a replacement lien, in Cash Collateral and accounts receivables generated postpetition, equal to the diminution, if any, subsequent to the Petition Date, in value of the Lenders' interest in the Cash Collateral.  Each such replacement lien shall have the same priority as the Lender had on Debtors' Accounts Receivables as of the Petition Date.

69.     The Debtors project that creation of new net Accounts Receivables during the Budget period will equal or exceed the amount of Cash Collateral expended by the Debtors during the same time-period.

70.     Pursuant to the Cash Collateral Motion, the Debtors request:  (i) Entry of an order setting an emergency hearing pending final hearing on Debtors' use of cash collateral and authorizing use of cash collateral in an amount necessary to avoid immediate and irreparable harm to the estate pending an emergency hearing on use of cash collateral; (ii) Entry of an order directing all entities that have taken possession of Cash Collateral following the Petition Date to return such amounts by wire transfer to the Debtors US Bank Account # 145592399904 within 24 hours of receiving service of the order granting this Motion; (iii) Entry of a preliminary emergency cash collateral order granting Debtors authority to use sufficient cash collateral to avoid immediate and irreparable harm to the estate pending a final hearing on Debtors' use of

cash collateral in a form substantially similar to the proposed order attached to the Cash

Collateral Motion as **Exhibit C**; (iv) A final cash collateral order authorizing Debtors to use cash

collateral for payment of the normal and necessary expenses of operating its business during the

pendency of this case; (v) Entry of an order directing service of the instant Motion and any order

entered on the instant Motion as the Court deems appropriate under the circumstances; and (vi)

For such other and further relief as the Court may deem just and equitable.

Motion Authorizing Maintenance of Cash Management

71.     The Debtors have filed a motion for entry of an order pursuant to sections 361 and

363 of the Bankruptcy Code and Bankruptcy Rule 4001(B) Authorizing Debtors to Maintain

their Cash Management System and to Continue Use of Certain Existing Bank Accounts,

Deposit Practices and Certain Business Forms (the "Cash Management Motion").

72.     Each of the Debtor A/R Borrowers has two lockbox accounts with Citizens Bank

of Pennsylvania, as set forth on **Exhibit A** to the Cash Management Motion (the "Gemino

Lockbox Accounts").

73.     The Debtors are requesting entry of an order directing Gemino to transmit, on a

daily basis, all funds deposited into the Gemino Lockbox Accounts to HMC/CAH's account at

US Bank # 145592399904.  At some point in the near future, all account debtors depositing

funds into the Gemino Lockbox Accounts will be notified to make their deposits to HMC/CAH's

account at US Bank # 145592399904.  Once all such account debtors are complying with this

direction from the Debtors, the Debtors will close each of the Gemino Lockbox Accounts.

74.     The accounts that the Debtors anticipate using in the ordinary course throughout

these bankruptcy cases are set forth at **Exhibit B** to the Cash Management Motion..

75.     The Debtors' payroll obligations are paid through HMC/CAH accounts at US Bank and also through various subsidiary payroll accounts.  The Debtors utilize the services of Automatic Data Processing, Inc. ("ADP") for its payroll and related services.  The Debtors anticipate continuing to utilize the services of ADP post-petition.

76.     Pursuant to the Cash Management Motion, Debtors request, among other things: (i) a waiver of the requirement that it open new bank accounts as their Debtors-in-Possession accounts subject to the terms of this Motion; (ii) an order of the Court directing Citizens Bank of Pennsylvania to sweep, on a daily basis, all funds in the Gemino Lock Box Accounts to the HMC/CAH US Bank operating account #145592399904; (iii) authorization for the Debtors to direct all third party payors to make payments to HMC/CAH US Bank operating account #145592399904; (iv) authority to terminate all of the Gemino Lock Box Accounts once all account debtors and third party payors have transitioned or begun making deposits to the Debtors operating accounts at US Bank; and (v) approval to maintain and continue to use without change in account number its existing accounts identified on **Exhibits A and B** to the Cash Management Motion, as Debtors-in-Possession Accounts, without the necessity of placing the legend "Debtor-in-Possession" on those forms or other business forms of the Debtors.

Employee Wage Motion

77.     The Debtors have filed a motion for an order authorizing the payment of pre-petition employee claims and the continuation of employee benefit plans and related relief (the "Employee Wage Motion").

78.     As of the Petition Date, all group health, dental and vision insurance premiums for pre-petition time periods have been paid and are not in arrears as to any Employee.  As such,

the Debtors do not believe any Employee has a pre-petition claim for health, dental or vision benefits.

79.     The Debtors also provide paid vacation, sick-leave and paid-time off (collectively "PTO").  Employees accumulate hours of PTO based on seniority and hours worked.

80.     Rather than monetize such unpaid sums, the Debtors propose honoring PTO requests in the ordinary course of business such that an Employee who decides to take a day off or take a vacation may continue to do so provided it is scheduled in accordance with ordinary and customary practices for requesting PTO.  As such, the Debtors do not expect to have any significant expenditures relating to PTO.

81.     To avoid the hardship that Debtors' Employees may otherwise suffer and maintain morale, Debtors seek authority to satisfy and pay Debtors' pre-petition Employee claims.  Debtors also request authority to pay any related deductions and payroll tax withholdings.  In addition, Debtors seek authorization to continue all of its present employee benefit plans.  Certain of these amounts overlap from pre-petition to post-petition and Debtors also seek authority to pay these limited pre-petition Employee claims to and on behalf of the Employees whenever such payment obligations fall due.

82.     To the extent of $11,750 of Compensation per Employee, the Debtors seek authority to pay such amount as a priority claim pursuant to section 507(a)(4) of the Bankruptcy Code.  Because such claims must be paid in full under a plan of reorganization, payment of such claims at this time is appropriate.  Debtors estimate that the total amount of such priority claims is approximately $1,200,000 excluding consideration of PTO.  Debtors do not believe any of the Employees' PTO incurred within the 180 days before the Petition Date would, when taken

together with the wages and benefits, exceed the section 507(a)(4) cap for any of the Employees subject to the Employee Wage Motion.

83.    Pursuant to the Employee Wage Motion, the Debtors respectfully request that the Court enter an Order: (A) authorizing them to (i) pay the pre-petition Employee Claims as follows: (a) payroll and health insurance in an amount not to exceed $1,200,000; (b) expense reimbursement in an amount not to exceed $50,000; and (c) honoring PTO in the ordinary course of business according to existing policies; (ii) continue all existing Employee Benefit Plans; and (iii) omit the Employees claims from the schedules, matrix and service lists, limit notice on the Employees; (B) authorizing and directing all banks to receive, process, honor and pay any and all checks or electronic transfers drawn on the Debtors' payroll and general accounts related to the Employee Compensation and Employee Benefits, (C) prohibiting the Debtors' banks from placing any holds on, or attempting to reverse, any automatic transfers to any account of an Employee or other party for Employee Compensation, (D) authorizing them to issue new postpetition checks or effect new postpetition fund transfers on account of the prepetition Employee obligations to replace any prepetition checks or fund transfer requests that may be dishonored or rejected, and (E) granting such other and further relief as is just and proper.

Utility Motion

84.    The Debtors have filed a motion for an order determining adequate assurance of payment for post-petition utility services (the "Utility Motion").

85.    Historically, the Debtors have paid their utilities in a timely manner.

86.    Pursuant to the Utility Motion, the Debtors respectfully request that the Court enter an Order: (1) approving the Debtors' Proposed Adequate Assurance and the Adequate Assurance Procedures whereby the Utility Providers may request additional or different adequate

assurance; (2) determining that the Utility Providers have been provided with adequate assurance

of payment within the meaning of section 366 of the Bankruptcy Code; (3) prohibiting the Utility

Providers from altering, refusing or discontinuing services on account of pre-petition amounts

outstanding; (4) establishing procedures for the Utility Providers to seek to opt out of the

Debtors' proposed adequate assurance procedures; and (5) for such other relief as is just and

proper.

Motion to Dispense With Ombudsman Requirement

87.     The Debtors have filed a motion seeking an order under sections 333 and 105 of

the Bankruptcy Code determining that appointment of a patient care ombudsman is not needed

given the particular facts of this case (the "Ombudsman Motion").

1.     There are numerous reasons why the appointment of a patient care ombudsman is

not warranted in this case.  As noted above, the Debtors' bankruptcy filing has been wholly

driven by ordinary debt issues.  None of the debt issues which have precipitated this bankruptcy

filing relate to patient care issues.  Rather, as indicated in the Debtors' other pleadings, the

bankruptcy filing represents the Debtors' best chance to resolve the debt issues which have

stalled their efforts to expand and upgrade certain of their medical care facilities.  The

achievement of these goals will inure to the benefit of patients by raising the level of patient care

and cementing the long-term availability of medical care to otherwise underserved rural

communities.

88.     Licensing and regulating agencies play a pervasive role in serving to ensure that

patient care at the Hospital Debtors is exemplary.   The Hospital Debtors are subject to stringent

review and accreditation by various supervising entities in their respective states and localities,

including the Office of the Inspector General for the U.S. Department of Health and Human

Services ("OIG"), the Centers for Medicare and Medicaid Studies ("CMS"), the Joint

Commission on Accreditation of Healthcare Organizations ("JCAHO"), the Accreditation

Association for Ambulatory Health Care ("AAAHC"), the Kansas Department of Health and

Environment ("KDHE"), the Missouri Department of Health and Senior Services

("MDHSS"), the Oklahoma State Department of Health ("OSDH"), the Tennessee Department

of Health ("TDH"), and the North Carolina Division of Health Service Regulation ("NCDHSR"

and collectively, the "Regulatory Bodies"). All of the above agencies, groups, and associations

are supervising entities which actively assess patient care issues at the Debtors' facilities.

89.     In their respective states, the Debtors are currently monitored by KDHE, MDHSS,

OSDH, TDH, NCDHSR (either in their state regulatory capacities or as agents for the Centers

for Medicare and Medicaid Services ("CMS"), JCAHO, and AAAHC.  All of the Hospital

Debtors have had on-site original surveys or follow-up surveys in 2011 and all of the Hospital

Debtors are accredited or compliant with all conditions.

90.     The ability of patients to protect their rights is signified by the posting in the

lobby of a Bill of Patient Rights, the ability of the patient to file complaints and grievances and

the requirement of the institutions to follow up on those complaints and grievances. The Hospital

Debtors also must and do recognize patient rights under the Emergency Medical Treatment and

Active Labor Act ("EMTALA") and the Health Insurance Portability and Accountability Act

("HIPAA").  A full complement of organizational policies support and operationalize these

requirements and safeguards at each Hospital Debtor.

91.     In addition, the CEO at each one of the Hospital Debtors functions as an

"ombudsman" with respect to patient complaints and concerns – with such issues resolved at the

highest levels of the organization.  These executives are intimately involved in the daily

management of the facilities, and because of the close relationship between the facility and the surrounding community, these CEOs are constantly available.  Furthermore, each facility is required to maintain an "advisory board" which serves as a source of advice and a conduit to the community.

92.     The Debtors believe that the appointment of a patient care ombudsman would prove to be an unnecessary and burdensome requirement for the Debtors.  As noted above, ample protections exist to protect the interests of patients during the pendency of these bankruptcy proceedings.  Appointment of the patient care ombudsman would create an unnecessary administrative expense for the estate and provide no additional benefit over and above the robust pre-existing safeguards that are in place.

FURTHER AFFIANT SAYETH NOT

I declare under penalty of perjury that the foregoing is true and correct.

*/s/  Dennis Davis*
DENNIS DAVIS
CHIEF LEGAL OFFICER AND SECRETARY

Subscribed and sworn to before me this 11th day of October, 2011.

*/s/   Karen S. Shackelford*
Notary Public

My Commission Expires:

September 8, 2012

[SEAL]